# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

ALL FUNDS AND DIGITAL CURRENCY IN XAPO, INC.   Case Number: **18-M-1220**
ACCOUNT NUMBER 8581049, INCLUDING ALL
SUB-WALLETS AND WALLETS, IN THE NAME OF
OVIDIU LAURENTIU PIROS WITH ASSOCIATED EMAIL
ADDRESS OF OVIDIU.PIROS@PROTONMAIL.COM

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, Scott Simons, being duly sworn depose and say:

I am a Task Force Officer assigned to the Drug Enforcement Administration, and have reason to believe that in the Northern District of California there is now certain property, namely, all funds and digital currency in Xapo, Inc. account number 8581049, including all sub-wallets and wallets, in the name of Ovidiu Laurentiu Piros with associated email address of ovidiu.piros@protonmail.com, that is civilly forfeitable under 21 U.S.C. § 881(a)(6) and 18 U.S.C. §§ 981(a)(1)(A), (a)(1)(C), and 984, and criminally forfeitable under 21 U.S.C. § 853 and 18 U.S.C. § 982(a)(1) and 28 U.S.C. § 2461, as (1) proceeds of, and property used to facilitate, drug trafficking in violation of 21 U.S.C. §§ 829(e), 841(a)(1), 841(h), and 846, and (2) as property involved in money laundering transactions and a conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and (a)(1)(B)(i) and 1956(h), and which property is therefore also subject to seizure for purposes of civil forfeiture under 18 U.S.C. § 981(b) and for purposes of criminal forfeiture under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

The application is based on these facts:

   ✓ Continued on the attached sheet.

   ❑Delayed notice of _____ days (give exact ending date if more than 30 days:_____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Sworn to before me, and subscribed in my presence

_____
Signature of Affiant
Scott Simons, DEA

**1/19/18 @ 1:10 p.m.**
Date and time issued

at Milwaukee, Wisconsin
City and State

William E. Duffin, U.S. Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF
## APPLICATIONS FOR SEIZURE WARRANTS

I, Scott Simons, being first duly sworn, hereby depose and state as follows:

### I. BACKGROUND

1. I am a Task Force Officer assigned to the Milwaukee Office of the Drug Enforcement Administration (DEA) as a member of the Tactical Diversion Squad (TDS) specializing in pharmaceutical investigations. I have worked full-time as a Federal Task Force Officer for the past 4 years and a full-time law enforcement officer with the Greenfield Police Department for the past 15 years.

2. During my tenure as a DEA Task Force Officer and a Greenfield Police Department law enforcement officer, I have been involved in the investigation of narcotics traffickers operating in not only the County of Milwaukee and the State of Wisconsin but also other states throughout the United States. I have received training in the investigation of drug trafficking and computer-related crimes. I have worked with informants in the investigations of drug trafficking in the Milwaukee area as well as other jurisdictions within the State of Wisconsin and throughout the United States. I have participated in the application for and execution of numerous search warrants. I have participated directly in numerous narcotics investigations and arrests in which controlled substances and drug paraphernalia were seized. I have conducted several investigations that have resulted in seizures of criminally derived property, including monetary instruments.

3.     Based on my training, experience, and participation in drug trafficking and

computer-related investigations, I know and have observed the following:

a.     I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

b.     I know drug traffickers often purchase and/or title assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in the names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

c.     I know drug traffickers must maintain on-hand large amounts of U.S. currency to include stored in financial accounts readily accessible in order to maintain and finance their ongoing drug business;

d.     I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

e.     I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency; and

f.     I know that Bitcoin and other crypto currency accounts are often times used by drug traffickers to launder money or conceal drug proceeds because of the anonymity associated with use of Bitcoin and other crypto currency accounts and because crypto currency is decentralized.

4.     This affidavit is based upon my personal knowledge as well as information

reported to me by other federal, state, and local law enforcement officers during the

course of their official duties, all of whom I believe to be truthful and reliable. This

2

affidavit is also based upon information gathered from interviews of citizen witnesses, reports, official records, law enforcement reports, and my training and experience.

5. Because this affidavit is submitted for the limited purpose of securing authorization for seizure warrants, I have not included each fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish probable cause.

## II. ITEMS SOUGHT FOR SEIZURE

6. For the reasons set forth below, I submit this affidavit in support of applications for seizure warrants authorizing seizure of all funds and digital currencies, in the following Xapo, Inc. accounts ("Subject Accounts"):

a) Xapo account #7756632, which contains sub-wallets #6943728 (0.01415264 Bitcoin), #6943729 (0.00 Bitcoin), #6943768 ($471.71009522 USD), #11172604 (7.06392978 Bitcoin Cash), and #13214012 (.56980749 Bitcoin Gold), in the name of COSMIN MUNTEAN with associated email address of software@azecalpha.com;

b) Xapo account #8581049, which contains sub-wallets #9726599 (0.25308166 Bitcoin), #9726600 (0.0 Bitcoin), #9726608 ($5.62582401 USD), #9726609 (0.00 Romanian Lei), #11197771 (0.00 Bitcoin Cash), and #13229718 (0.2152527 Bitcoin Gold), in the name of OVIDIU LAURENTIU PIROS with associated email address of ovidiu.piros@protonmail.com;

c) Xapo account #8580921, which contains sub-wallets #9725921 (11.23091204 Bitcoin), #9725922 (0.00 Bitcoin), #9725941 ($0.71671488 USD), #9725942

(0.00 Romanian Lei), #11179406 (0.00 Bitcoin Cash), and #13220482 (1.74698444 Bitcoin Gold) in the name of DORIN GABRIEL PORUTIU with associated email address of Gabriel.porutiu@protonmail.com;

d) Xapo account #8851070, which contains sub-wallets #10802169 (0.00478855 Bitcoin), #10802170 (0.00 Bitcoin), #10802184 ($48.01928885 USD), #10802185 (0.00 Romanian Lei), and #13223884 (4.02086405 Bitcoin Gold), in the name of CRISTIAN MUNTEAN with associated email address of bro_trans@yahoo.com; and

e) Xapo account #8851037, which contains sub-wallets #10802044 (0.09093043 Bitcoin), #10802045 (BTC), #10802052 ($0.00 USD), #10802053 (0.00 Romanian Lei), #10851552 (0.00 Romanian Lei), and #13261142 (0.09093043 Bitcoin Gold), in the name of ADRIANA MARIAN with associated email address of adrianne3001@yahoo.com.

7. For the reasons set forth below, I submit that there exists probable cause to believe that these funds, including digital currencies, are:

a) Subject to civil forfeiture to the United States under Title 21, United States Code, Section 881(a)(6) (authorizing civil forfeiture of proceeds of sales of controlled substances and money intended to be exchanged for controlled substances), Title 18, United States Code, Section 981(a)(1)(C) (authorizing civil forfeiture of proceeds of sales of controlled substances), and under the fungible-property provisions of Title 18, United States Code, Section 984, and subject to criminal forfeiture under Title 21, United States Code,

Section 853 (authorizing criminal forfeiture of proceeds of sales of controlled substances and property intended to facilitate the commission of controlled substance offenses), as proceeds of, and property used to facilitate, drug trafficking in violation of Title 21, United States Code, Sections 829(e), 841(a)(1), 841(h) and 846;

b) Subject to civil forfeiture to the United States under Title 18, United States Code, Section 981(a)(1)(A) (authorizing civil forfeiture of property "involved in" money laundering), and subject to criminal forfeiture under Title 18, United States Code, Section 982(a)(1) (authorizing criminal forfeiture of property "involved in" money laundering) and Title 28, United States Code, Section 2461, as property involved in money laundering transactions and a conspiracy to commit money laundering, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and (a)(1)(B)(i) and 1956(h); and

c) Subject to seizure for purposes of civil forfeiture under 18 U.S.C. § 981(b) and for purposes of criminal forfeiture under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

## III. STATUTORY BACKGROUND

8.     The Ryan Haight Online Pharmacy Consumer Protection Act of 2008 amended the Controlled Substances Act to address online pharmacies, codified at Title 21, United States Code (U.S.C.), § 829. No controlled substance that is a prescription drug, as determined by the Federal Food, Drug and Cosmetic Act, may be delivered,

distributed, or dispensed by means of the Internet without a valid prescription, as required by Title 21, Code of Federal Regulations (C.F.R.) § 1306.09(a) in violation of Title 21, U.S.C. § 829(e), § 841(a)(1) (Distribution of Controlled Substances) and 21 U.S.C. § 841(h), § 843(c)(2)(A) (Offenses involving distribution of Controlled Substances by means of the Internet). According to Title 21 U.S.C. § 829, the term "valid prescription" means a prescription that is issued for a legitimate medical purpose in the usual course of professional practice by a practitioner who has conducted at least 1 in-person medical evaluation of the patient or a covering practitioner. The term "in-person medical evaluation" means a medical evaluation that is conducted with the patient in the physical presence of the practitioner, without regard to whether portions of the evaluation are conducted by other health professionals. The term "covering practitioner" means, with respect to the patient, a practitioner who conducts a medical evaluation (other than an in-person medical evaluation) at the request of a practitioner who has conducted at least 1 in-person medical evaluation of the patient or an evaluation of the patient through the practice of telemedicine, within the previous 24 months and is temporarily unavailable to conduct the evaluation of the patient.

9.     The Ryan Haight Online Pharmacy Consumer Protection Act of 2008 also added new provisions to prevent the illegal distribution of controlled substances by means of the Internet including registration requirements of online pharmacies, Internet pharmacy website disclosure information requirements and prescription reporting requirements for online pharmacies. According to C.F.R. § 1301.11(b) as provided in § 303(f) and § 401(h) of the Act (21 U.S.C. § 823(f) and § 841(h)), it is unlawful for any person

who falls within the definition of "online pharmacy" (as set forth in §102(52) of the Act (21 U.S.C. § 802.52) and C.F.R. § 1300.4(h)) to deliver, distribute or dispense a controlled substance by means of the Internet if such person is not validly registered with a modification of such registration authorizing such activity (unless such person is exempt from such modified registration requirement under the Act or this chapter). A check of DEA records does not identify Goldpharma24 as a registered online pharmacy.

## III. PROBABLE CAUSE

10. In February of 2015, the Milwaukee District Office of the DEA initiated an investigation into the internet pharmacy GOLDPHARMA24 located at www.goldpharma-24.com, which advertises for sale controlled and non-controlled pharmaceuticals, including schedule II controlled substances, without requiring a prescription for such substances.

11. On June 25, 2015, case agents conducted an undercover purchase from the GOLDPHARMA24 internet pharmacy at website www.goldpharma-24.com. Case agents attempted to purchase 60 tablets of Percocet 10mg (Oxycodone, a schedule II controlled substance). To facilitate the purchase, case agents were instructed to wire money by Western Union to MOHD SABUDDIN RAFIK SHAIKH in India. Case agents subsequently received a shipment from India of red tablets, which were not the ordered Percocet. After receiving the red tablets instead of the ordered Percocets, case agents contacted the GOLDPHARMA24 website via telephone and emails in response to not receiving the ordered product. Case agents were informed that they did not have a distributor who could reship Percocet at this time so case agents were instructed to select

anything else off their internet pharmacy website to order. Case agents subsequently ordered and received in September 2015, 90 tablets of Tramadol 200mg (a schedule IV controlled substance) from India and 60 tablets of Xanax .25mg (alprazolam, a schedule IV controlled substance) from Cluj, Romania. These medications were sent to the DEA laboratory in Chicago and tested positive for the presence of the indicated drugs. Along with the Xanax medication, case agents received a computer printed and electronically signed prescription in the undercover name by Dr. LADISLAV SMRCEK. The undercover agent never received an examination and was never questioned about medical history, current medications, or symptoms, which would be required to be prescribed this medication.

12. Subpoenaed records from Western Union revealed that there was another potential customer of GOLDPHARMA24 who also wired money to MOHD SABUDDIN RAFIK SHAIKH in India. This potential customer was identified as JAMES E. CARTER residing in Brooklyn Park, Minnesota. Subpoenaed records revealed that CARTER wired money at least fourteen (14) times to people in India, Romania, and Pakistan. In August of 2015, case agents interviewed CARTER. CARTER stated he first located an internet pharmacy located at www.24hsmeds.com and he stated he has purchased Tramadol (a schedule IV controlled substance) from this internet pharmacy numerous times without a prescription. CARTER showed case agents the emails he received related to these orders, which revealed that he communicated by email with jessicagilmore24hs@gmail.com and peppysenn24hs@gmail.com regarding his purchases of controlled substances. CARTER also stated that he communicated by telephone with

the representative at (810) 487-4516, which is the same telephone number used by GOLDPHARMA24. CARTER voluntarily turned over to case agents a quantity of Tramadol and suspected Viagra pills, which he said he purchased from the internet pharmacy. Western Union records revealed CARTER also wired money to COSMIN MUNTEAN and OVIDIU-LAURENTIU PIROS in Romania for the purchases of controlled substances.

13. On August 28, 2015, case agents conducted an undercover purchase from the GOLDPHARMA24 internet pharmacy at website www.goldpharma-24.com. Case agents purchased 180 tablets of Soma 500mg (carisoprodol, which is a schedule IV controlled substance) and 120 tablets of Valium (diazepam, which is a schedule IV controlled substance). In connection with the purchase, case agents were instructed via email to wire money by Western Union to CHARANJEET KAUR in India. Case agents received a shipment from India of the 180 tablets of Soma 500mg and a shipment from Cluj, Romania of the 120 tablets of Valium accompanied by another computer printed prescription with an electronic signature of Dr. LADISLAV SMRCEK. These medications were sent to the DEA laboratory in Chicago and tested positive for the presence of the indicated drug.

14. In January of 2016, case agents interviewed BEVERLY E. BOOTZIN who had been making payments to a PayPal account used by the GOLDPHARMA24 DTO. BOOTZIN stated she has purchased controlled substances from internet pharmacies without a prescription. She recalled specifically purchasing Tramadol (a schedule IV controlled substance) multiple times. BOOTZIN could not recall the specific internet

pharmacy names she purchased from, but did provide a pharmacy representative email address she communicated with of jessicagilmore24hs@gmail.com and phone numbers of (810) 487-4510 and (810) 487-4511, both of which are telephone numbers associated with the GOLDPHARMA24 Nextiva phone account. BOOTZIN admitted to purchasing various types of controlled substances from internet pharmacies and made some of the payments by Western Union. Subpoenaed Western Union records revealed that BOOTZIN made payments to AXENTE SERGIU BOLDIS and OVIDIU LAURENTIU PIROS, both in Cluj, Romania. Tramadol medication was seized from BOOTZIN's residence and later tested positive for the presence of the indicated drug when submitted to the DEA laboratory in Chicago.

15.    On February 2, 2016, case agents executed a federal search warrant at the residence of ANTHONY T. HARDY located at 1511 Brady Ct. Bowie, Maryland 20721. Open source records directed case agents to HARDY because HARDY was affiliated with the internet pharmacy GOLDPHARMA24. HARDY agreed to cooperate and voluntarily provided a statement to law enforcement. HARDY admitted to being involved in internet pharmacies since approximately 1999 or 2000. He is a member of multiple affiliate groups that sell controlled and non-controlled prescription medications. HARDY stated that his role was to register thousands of prescription drug domains and create websites for the affiliate groups. HARDY stated that he would then be paid a commission based on how many customers would purchase prescription drugs from his domains or through his links directing the customers to the affiliate group's websites. HARDY would pay internet-based companies to help promote and advertise his websites and links. HARDY

stated that he had no role in taking the drug orders or shipping the drugs as that role is handled by other unknown persons in the organization. HARDY admitted that he knew that the internet pharmacies were illegally trafficking controlled substances and pharmaceuticals.

16.     HARDY identified the affiliate group, which sold the majority of controlled substances as the "Biff Affiliate Group." HARDY gave consent for investigators to log into this account using his username and password. It was confirmed that GOLDPHARMA24 is an internet pharmacy affiliated with this "Biff Affiliate Group." HARDY stated that the affiliate group manager who he communicated with about registering and creating websites for these internet pharmacies and receiving his payments is "Biff Tannen" with email address 01bifftannen@gmail.com. This contact information for the affiliate manager was accessible by investigators only after logging into HARDY's account as an affiliate group member. HARDY stated that he believed he was paid commission by this affiliate group into his PayPal account. Case agents then executed a search warrant on Comcast Internet Provider and received email content related to HARDY's athardy@comcast.net email account. Case agents reviewed these emails and found email communication between HARDY and "Biff Tannen" regarding GOLDPHARMA24, including emails in which HARDY was requesting his commission for registering and creating websites for GOLDPHARMA24 and other associated internet pharmacies that were illegally selling controlled substances and pharmaceuticals. HARDY stated he communicated with "Biff Tannen" at bifftannen01@yahoo.com.ar.

17. On April 1, 2016, case agents executed search warrants on email addresses for "Biff Tannen" and other email addresses used by GOLDPHARMA24 representatives, which case agents communicated with to purchase controlled substances. A review of these emails revealed that customers were being directed by GOLDPHARMA24 representatives to send payment for their purchases of controlled substances to the following individuals via Western Union and Money Gram:

- AXENTE SERGIU BOLDIS in Cluj, Romania

- COSMIN MUNTEAN in Cluj, Romania

- OVIDIU LAURENTIU PIROS in Cluj, Romania

- GEORGETA DANIELA ZORAN in Cluj, Romania

- CRISTIAN MUNTEAN in Cluj, Romania

18. On July 19, 2016, case agents conducted an undercover purchase from the GOLDPHARMA24 internet pharmacy at website www.goldpharma-24.com. Case agents purchased 80 tablets of Codeine 15mg (which is a schedule II controlled substance). In connection with the purchase, case agents were instructed via email to first wire money via Money Gram to CRISTIAN MUNTEAN in Cluj, Romania and later case agents were directed to wire money to GEORGETA DANIELA ZORAN in Cluj, Romania. Case agents received a shipment from Cluj, Romania of the 80 tablets of Codeine 15mg accompanied by another computer printed prescription with an electronic signature of Dr. LADISLAV SMRCEK. This medication was sent to the DEA laboratory in Chicago and did test positive for the presence of the indicated drug.

19.	On November 3, 2016, case agents conducted an undercover purchase from the GOLDPHARMA24 internet pharmacy at website www.goldpharma-24.com. Case agents purchased 80 tablets of Codeine 15mg (which is a schedule II controlled substance). In connection with the purchase, case agents were instructed via email to wire money by Money Gram to MARIANA ZORAN in Cluj, Romania. Case agents received a shipment from Romania of the 80 tablets of Codeine 15mg accompanied by another computer printed prescription with an electronic signature of Dr. LADISLAV SMRCEK. This medication was sent to the DEA laboratory in Chicago and did test positive for the presence of the indicated drug.

20.	On December 9, 2016, case agents conducted an undercover purchase from the GOLDPHARMA24 internet pharmacy at website www.goldpharma-24.com. Case agents purchased 80 tablets of Codeine 15mg (which is a schedule II controlled substance). In connection with the purchase, case agents were instructed via email to wire money by Money Gram to MARIANA ZORAN in Cluj, Romania. Case agents received a shipment from Romania of the 80 tablets of Codeine 15mg accompanied by another computer printed prescription with an electronic signature of Dr. LADISLAV SMRCEK. This medication was sent to the DEA laboratory in Chicago and did test positive for the presence of the indicated drug.

21.	On January 17, 2017 and February 14, 2017, case agents interviewed a Source of Information (SOI). The SOI first was introduced to internet pharmacies in 2009 and was asked to start an internet pharmacy in Romania due to its low costs. The secondary reason for choosing Romania was because U.S. customers were primarily

13

targeted and Romania carried brand name pharmaceuticals that are well known to the United States. The SOI identified COSMIN MUNTEAN and CRISTIAN MUNTEAN and stated that COSMIN MUNTEAN is the leader of the drug trafficking organization in Romania. The SOI stated that COSMIN MUNTEAN has partnerships with multiple Romanian pharmacies where he acquires the drugs and knows the doctor who authorizes the prescriptions.

22. Case agents believe the information provided by the SOI to be truthful and reliable because the SOI has provided information regarding the drug trafficking activities of COSMIN MUNTEAN, which case agents have been able to corroborate through surveillance, controlled buys, wire intercepts and other witness and law enforcement reporting. The SOI provided this information without any expectation of monetary gain and is not cooperating for consideration on pending or potential charges. The SOI stated that s/he has witnessed COSMIN MUNTEAN go to these pharmacies where he acquires boxes of pre-packaged drug shipments. The SOI stated COSMIN MUNTEAN has been operating this DTO since approximately 2011 or 2012. The SOI identified COSMIN MUNTEAN's work partner as OVIDIU LAURENTIU PIROS. The SOI identified multiple countries where COSMIN MUNTEAN has bank accounts, which he is using to launder the drug proceeds and identified different types of businesses COSMIN MUNTEAN invests in using his drug proceeds to launder the money. The SOI estimated COSMIN MUNTEAN has profited approximately $70 million USD from operating these illegal internet pharmacies, which primarily target customers in the United States.

23.     On January 25, 2017, case agents interviewed a confidential source who stated that s/he had operated an illegal internet pharmacy in Florida from 2012 until 2015. The confidential source stated that s/he illegally obtained controlled substances from COSMIN MUNTEAN and MUNTEAN's company in Romania. The confidential source paid MUNTEAN's company at various bank accounts to include two accounts in MUNTEAN's name located in Romania and the confidential source states that s/he wired approximately $1 million to MUNTEAN between May 2012 and the end of 2015. The confidential source stated that the majority of the controlled substances purchased via his/her illegal internet pharmacy were shipped by MUNTEAN's company, AZEC ALPHA, LTD, in Romania to customers in the United States. The confidential source stated that s/he eventually sold his/her illegal internet pharmacy to COSMIN MUNTEAN in exchange for COSMIN MUNTEAN paying the source a commission for the continued sales. The confidential source also provided financial documents showing these commission payments.     The confidential source stated s/he primarily communicated with COSMIN MUNTEAN's "employee" and coconspirator IOANNA BUZDUGAN at email address pharma.consulting@yahoo.com.  Documents that the confidential source provided to case agents revealed that the more than $1 million USD was paid to bank accounts in Cyprus, United Kingdom, and Romania and that these bank accounts were in the following names: COSMIN MUNTEAN, ADRIANA MARIAN (wife of COSMIN MUNTEAN) and AZEC ALPHA LTD. (COSMIN MUNTEAN's pharmaceutical business).

24. For several reasons, case agents believe that the confidential source is reliable and credible. First, the confidential source has been providing continuous information since June 2016. Second, the information s/he has provided is substantially against his/her penal interest. Third, the information provided by the confidential source is consistent with evidence obtained elsewhere in this investigation where the confidential source was not utilized, and substantial portions of the confidential source's information has been corroborated through independent investigation, including surveillance and information from other sources. The confidential source has no prior convictions and the confidential source is cooperating in exchange for consideration of his/her federal drug trafficking case for operating an illegal internet pharmacy.

25. On February 22, 2017, case agents executed a search warrant on the pharma.consulting@yahoo.com email address. Case agents reviewed this email account and confirmed the person primarily using this email account was IOANNA BUZDUGAN. These emails reveal that COSMIN MUNTEAN is in charge of the Romanian source of supply, that the majority of pharmaceutical orders are being shipped from a Romanian Post Office to customers in the United States, and that the DTO is aware this distribution is illegal. Review of further emails revealed that this Romanian source of supply is using prescriptions displaying the name of Dr. LADISLAV SMRCEK. Case agents also observed emails between GOLDPHARMA24 affiliate manager "Biff Tannen" and IOANNA BUZDUGAN at pharma.consulting@yahoo.com. The emails reveal that COSMIN MUNTEAN is sourcing GOLDPHARMA24, along with multiple other resellers i.e., other internet pharmacies, and these resellers are sending hundreds of thousands of

U.S. dollars for controlled substances to various accounts with the listed beneficiary as COSMIN MUNTEAN and AZEC ALPHA, LTD.

26.     On April 2, 2017, case agents conducted an undercover purchase from the GOLDPHARMA24 internet pharmacy at website www.goldpharma-24.com.     Case agents purchased 80 tablets of Codeine 15mg (which is a schedule II controlled substance).     In connection with the purchase, case agents were initially instructed via email to wire money by Money Gram to MARIANA ZORAN in Cluj, Romania, but the receiver was then changed to CRISTIAN MUNTEAN in Cluj, Romania. Per Money Gram records, CRISTIAN MUNTEAN picked up the drug payment from a Money Gram location on or before April 8, 2017.  DEA Romania SA Mark Koss communicated the details of this controlled buy to the Romanian National Police.  The Romanian National Police observed CRISTIAN MUNTEAN on April 6, 2017 and April 7, 2017 responding to Money Gram locations and a Romanian Post Office in Cluj, Romania.     Case agents received a shipment from Romania of the 80 tablets of Codeine 15mg accompanied by another computer printed prescription with an electronic signature of Dr. LADISLAV SMRCEK.     This medication was sent to the DEA laboratory in Chicago and did test positive for the presence of the indicated drug.

27.     On April 18, 2017, case agents identified multiple illegal internet pharmacies identifying the owner as AZEC ALPHA, LTD.  One of these internet pharmacies, 247MEDICATION, has video tutorials by IOANA BUZDUGAN.  Case agents created two undercover user accounts with 247MEDICATION to inquire about forms of payment.  Case agents received an email from an employee identifying herself

as "Ioana." This email was received from IP address 159.203.87.134 which is a server hosted by Digital Ocean.

28. On May 15, 2017, case agents received records from Digital Ocean in response to a subpoena. These records show IP address 159.203.87.134 is a Digital Ocean server rented by "Paul Barthfield" which is a known alias for COSMIN MUNTEAN. The user of this account reported their location to be in Romania, business name AZEC ALPHA, LTD, and listed their industry as "Pharmaceutical Industry." Subpoenaed Digital Ocean records reveal that this customer rents seven (7) servers with Digital Ocean, and each server is used to host an internet pharmacy, owned by AZEC ALPHA, LTD.

29. On May 9, 2017, case agents conducted an undercover purchase from the 247MEDICATION internet pharmacy at website www.247medication.com. Upon attempting to conduct this transaction, case agents were rerouted from 247MEDICATION to another identical internet pharmacy MYEUPRO at website www.myeupro.com. Case agents purchased 80 tablets of Codeine 15mg (which is a schedule II controlled substance) and 90 tablets of Xanax .25mg (alprazolam, which is a schedule IV controlled substance). In connection with the purchase, case agents were instructed via email to wire money by Money Gram to ZOITA FLORINA DARBAN in Romania. Case agents received one shipment from Romania of the 80 tablets of Codeine 15mg and one shipment of the 90 tablets of Xanax .25mg from Romania, both of which were accompanied by another computer printed prescription with an electronic signature of Dr. LADISLAV SMRCEK. These medications were sent to the DEA laboratory in Chicago and did test positive for the presence of the indicated drug.

30. On May 19, 2017, case agents received emails at two undercover email accounts, which were both used to create user accounts with 247MEDICATION/MYEUPRO internet pharmacies. These emails were to inform its customers that they are now accepting Bitcoin as a form of payment for the pharmaceutical purchases. This email was sent from office@myeupro.com utilizing IP address 192.241.244.42. This IP address had already been identified as being assigned to a Digital Ocean server, which was being rented by AZEC ALPHA, LTD and is known to be owned by COSMIN MUNTEAN.

31. On May 20, 2017, case agents logged into MYEUPRO internet pharmacy and proceeded with a purchase of 80 tablets of Codeine 15mg (which is a schedule II controlled substance) and 80 tablets of Valium 10mg (diazepam, which is a schedule IV controlled substance). Case agents selected to pay by Bitcoin for these controlled substances, which would be shipped, to West Allis, Wisconsin. Case agents received an email confirming the order for Codeine and Valium as well as providing the Bitcoin address 3NKe2GKDCbxivcyg2Sm6yXkyfE9mNJht9C where the drug payment should be transferred. Review of open source information revealed that this Bitcoin address belongs to a wallet hosted at Xapo, Inc., a crypto-currency company offering Bitcoin exchange, wallet, and vault services. Xapo, Inc. has an office located in Palo Alto, California located in the Northern District of California.

32. On May 24, 2017, case agents received records from Xapo, Inc. in response to a subpoena. These records revealed Bitcoin address 3NKe2GKDCbxivcyg2Sm6yXkyfE9mNJht9C is associated with a Xapo, Inc. Bitcoin

account listing to COSMIN MUNTEAN, with an address in Cluj, Romania, and email address software@azecalpha.com. COSMIN MUNTEAN provided a Romanian photo identification card and copy of a current Romanian utility bill to Xapo, Inc. at the time the account was created. Case agents reviewed account transactions and found fund transfers between COSMIN MUNTEAN's Xapo, Inc. Bitcoin account with other Xapo, Inc. Bitcoin accounts in the names of OVIDIU LAURENTIU PIROS, GABRIEL DORIN PORUTIU, CRISTIAN MUNTEAN, and ADRIANA MARIAN. Records were obtained for these additional Bitcoin accounts and all of these account holders provided Romanian photo identification and current Romanian utility bills to open the Bitcoin accounts.

33. On June 17, 2017, case agents executed a search warrant on Google obtaining records for email address 247med@gmail.com. This email address was used to register domain www.247medication.com, which is an internet pharmacy owned and operated by COSMIN MUNTEAN. The emails reveal the user of this account was referring to himself/herself as COSMIN MUNTEAN, "Paul Barthfield" (alias used by COSMIN MUNTEAN), ADRIANA MARIAN (COSMIN MUNTEAN's wife), and AZEC ALPHA, LTD. The emails confirmed a large network of illegal internet pharmacies and more specifically the same internet pharmacies being operated on Digital Ocean servers. In one email, COSMIN MUNTEAN requested an advertising company promote the internet pharmacy 247MEDICATION to U.S. customers only, and he referred to his business as AZEC ALPHA, LTD.

34. COSMIN MUNTEAN is operating his own internet pharmacies as well as sourcing multiple other organizations operating illegal internet pharmacies. The

majority of the customers are in the United States. The Romanian National Police received records from the Romanian Postal Service showing that since 2012, COSMIN MUNTEAN is responsible for at least 72,105 packages being shipped from Romania to the United States.

35. The Romanian National Police also conducted fifteen (15) judicially authorized phone intercepts of members of this DTO. Case agents received evidence informally and formally from the Romanian National Police pursuant to the Mutual Legal Assistance Treaty between the United States and Romania. Based upon review of phone intercepts, surveillance, review of emails obtained via search warrants, controlled purchases, and confidential source information, the roles of those members of the DTO who have Xapo, Inc. Bitcoin accounts have been identified as follows:

- COSMIN MUNTEAN – leader and coordinator of DTO;

- ADRIANA MARIAN (wife of COSMIN MUNTEAN) – receives drug payments and opens banks accounts for laundering drug proceeds;

- OVIDIU LAURENTIU PIROS – procures drugs and launders drug proceeds;

- GABRIEL DORIN PORUTIU – coordinates the receiving of drug payments; and

- CRISTIAN MUNTEAN (brother of COSMIN MUNTEAN) – ensures drug supply and ships drug packages

36. Review of the Romanian judicially authorized intercepts reveals the following:

- On May 31, 2017, COSMIN MUNTEAN spoke with one of his coconspirators, SORANA DORA BORDEANU, who told COSMIN MUNTEAN that Xapo approved his Bitcoin account.

- On June 12, 2017, OVIDIU LAURENTIU PIROS spoke with BORDEANU, who told him that his Xapo Bitcoin account was created.

- On June 14, 2017, COSMIN MUNTEAN spoke with BORDEANU and asked about his Xapo balance. COSMIN MUNTEAN said that when PIROS transferred funds from his Xapo account into COSMIN MUNTEAN's account, both their names appeared. BORDEANU explained this was because it was a transfer from one Xapo account to another Xapo account. COSMIN MUNTEAN told BORDEANU that he did not want his name to appear in the future because he wants to remain anonymous. During the conversation, BORDEANU said she manages PIROS' Xapo account and GABRIEL DORIN PORUTIU's Xapo account. Based upon case agents' review of the translated preliminary transcript of the call, their training and experience, and the investigation to date, MUNTEAN is telling his co-conspirators that when he is transferring funds from his Xapo Bitcoin account to PIROS' (his coconspirators' account), he wanted to remain anonymous because he was facilitating the transfer of drug proceeds.

- On June 15, 2017, COSMIN MUNTEAN spoke to BORDEANU and told BORDEANU that he was only able to retrieve 2000 lei (Romanian currency) using his Xapo Bitcoin card. COSMIN MUNTEAN stated he has problems reaching his daily limit and he directed BORDEANU to contact Xapo about this issue. Based upon case agents' review of the translated preliminary transcript of the call, their training and experience, and the investigation to date, MUNTEAN is telling his co-conspirator that he is attempting to obtain additional drug proceeds from his Bitcoin account and directs his co-conspirator to contact Xapo about the issue.

- On June 15, 2017, COSMIN MUNTEAN spoke to BORDEANU and BORDEANU reported to COSMIN MUNTEAN that PIROS' Bitcoin account was blocked because of an attempted $10,000 transaction. BORDEANU told COSMIN MUNTEAN that Xapo Bitcoin was requesting more information regarding the transaction. Based upon case agents' review of the translated preliminary transcript of the call, their training and experience, and the investigation to date, case agents believe that the attempted $10,000 transaction was a drug customer attempting to deposit the money into PIROS' Xapo Bitcoin account and that BORDEANU was telling MUNTEAN because Xapo is asking for additional information regarding the attempted deposit.

- On October 8, 2017, COSMIN MUNTEAN spoke to another of his coconspirators, LAURA BOLOJAN, and COSMIN MUNTEAN told

BOLOJAN that he withdrew money from his Bitcoin account using his Xapo card. COSMIN MUNTEAN provided BOLOJAN with his Xapo verification code.

37.    On December 15, 2017, case agents reviewed subpoenaed records from Xapo, Inc. related to the five (5) Subject Accounts. These records included balances, account holder information, and transaction history. Based upon their training and experience, the investigation to date, and review of the subpoenaed Xapo records, case agents believe that individual, end-user drug customers are depositing drug proceeds for their online pharmaceutical purchases into COSMIN MUNTEAN's Xapo account. Additionally, review of the subpoenaed Xapo records reveal that larger deposits, *i.e.*, thousands of dollars up to approximately \$14,000, are consistently being made into CRISTIAN MUNTEAN's Xapo account, OVIDIU LAURENTIU PIROS' Xapo Bitcoin account, and DORIN GABRIEL PORUTI's Xapo account, which are consistent with deposits being made by resellers, such as GOLDPHARMA24. For example, review of the subpoenaed records for CRISTIAN MUNTEAN's Xapo account revealed that his account was primarily receiving larger deposits, consistent with reseller payments, and these larger deposits were then subsequently transferred into COSMIN MUNTEAN's Xapo account. The following is an example of some of the smaller deposits, believed to be end-user drug customer payments, into COSMIN's account and the larger, reseller deposits, believed to be reseller or distributor payments, into CRISTIAN's account:

| Receiving Account | Date | Amount |
|---|---|---|
| Cosmin Muntean #7756632 | 12/11/2017 | $452.54 USD |
| Cosmin Muntean #7756632 | 12/10/2017 | $628.59 USD |
| Cosmin Muntean #7756632 | 12/10/2017 | $363.06 USD |
| Cosmin Muntean #7756632 | 12/9/2017 | $267.01 USD |
| Cosmin Muntean #7756632 | 12/8/2017 | $58.21 USD |
| Cosmin Muntean #7756632 | 12/8/2017 | $177.54 USD |
| Cristian Muntean #8851070 | 12/7/2017 | $6839.62 USD |
| Cosmin Muntean #7756632 | 12/4/2017 | $254.82 USD |
| Cristian Muntean #8851070 | 11/29/2017 | $11,113.02 USD |
| Cosmin Muntean #7756632 | 11/26/2017 | $315.43 USD |
| Cristian Muntean #8851070 | 11/17/2017 | $7,547.27 USD |
| Cosmin Muntean #7756632 | 11/15/2017 | $167.84 USD |
| Cristian Muntean #8851070 | 11/14/2017 | $8,957.12 USD |
| Cristian Muntean #8851070 | 11/6/2017 | $10,979.55 USD |

38.     Moreover, review of the subpoenaed Xapo records reveal that funds are consistently transferred from COSMIN MUNTEAN's Xapo account to PIROS' account, PORUTIU's account, and MARIAN's account. Based upon their training and experience, the investigation to date, and the review of the subpoenaed Xapo records, case agents believe these transfers from COSMIN MUNTEAN's Bitcoin account to the other Subject Accounts to be compensation from COSMIN MUNTEAN, the leader of the DTO, to his coconspirators for their participation and "work" for the DTO. Those payments thereby promote the commission, including the future commission, of the underlying drug offenses. The following is an example of some of the fund transfers made:

| Originating Acct. | Receiving Acct. | Date | Amount |
|---|---|---|---|
| Cristian Muntean #8851070 | Cosmin Muntean #7756632 | 12/4/2017 | $5,000 USD |
| Cosmin Muntean #7756632 | Gabriel Dorin Porutiu #8580921 | 11/29/2017 | $12,640 USD |
| Cristian Muntean #8851070 | Cosmin Muntean #7756632 | 11/24/2017 | $5,000 USD |
| Cosmin Muntean #7756632 | Gabriel Dorin Porutiu #8580921 | 11/21/2017 | $6,940 USD |
| Cristian Muntean #8851070 | Cosmin Muntean #7756632 | 11/7/2017 | $8,900 USD |
| Cosmin Muntean #7756632 | Gabriel Dorin Porutiu #8580921 | 11/6/2017 | $8,350 USD |
| Cosmin Muntean #7756632 | Gabriel Dorin Porutiu #8580921 | 10/26/2017 | $8,500 USD |
| Cosmin Muntean #7756632 | Adriana Marian #8851037 | 10/13/2017 | $7,000 USD |
| Cristian Muntean #8851070 | Cosmin Muntean #7756632 | 10/6/2017 | $5,000 USD |
| Cosmin Muntean #7756632 | Adriana Marian #8851037 | 10/4/2017 | $10,000 USD |
| Cosmin Muntean #7756632 | Gabriel Dorin Porutiu #8580921 | 10/4/2017 | $5,735 USD |
| Cristian Muntean #8851070 | Cosmin Muntean #7756632 | 10/3/2017 | $5,000 USD |
| Cosmin Muntean #7756632 | Adriana Marian #8851037 | 9/29/2017 | $10,000 USD |
| Cosmin Muntean #7756632 | Gabriel Dorin Porutiu #8580921 | 9/29/2017 | $7,655 USD |
| Cosmin Muntean #7756632 | Adriana Marian #8851037 | 9/27/2017 | $10,000 USD |
| Cosmin Muntean #7756632 | Adriana Marian #8851037 | 9/21/2017 | $10,000 USD |
| Cosmin Muntean #7756632 | Adriana Marian #8851037 | 9/18/2017 | $10,000 USD |
| Cosmin Muntean #7756632 | Ovidiu Laurentiu Piros #8581049 | 6/12/2017 | $8,867 USD |

39. Review of the subpoenaed Xapo records for COSMIN MUNTEAN's Xapo account revealed two fund transfers into COSMIN MUNTEAN's Xapo account from another Xapo account holder identified by Xapo records as SHAWN B. TOWNSEND residing in Brentwood, Tennessee. These transfers were on October 25, 2017 for .03597699 Bitcoins (approximately $198.20 USD) and on November 28, 2017 for .02003436 Bitcoins (approximately $198.30 USD). Based upon their training and experience and the investigation to date, case agents know that these deposit amounts are consistent with customer purchases of a one-month supply of controlled pharmaceuticals or non-controlled prescription medication. Additionally, because the dollar amounts are almost identical each month it appears the customer may be refilling the same pharmaceutical medication from one month to the next.

40.     On January 8, 2018, case agents interviewed SHAWN B. TOWNSEND. TOWNSEND stated in approximately September of 2017, he located an Internet pharmacy he called "ClubVIP247" (the actual name is 247CLUBVIP) and TOWNSEND made two purchases of 90 tablets of UltraCod, which contains Codeine and acetaminophen (a schedule III controlled substance) for back pain via the internet pharmacy. TOWNSEND paid for these purchases by sending money to Romania via Money Gram. TOWNSEND stated he subsequently created a Bitcoin account and made two more purchases of UltraCod (a schedule III controlled substance), which he paid for using this Bitcoin account. TOWNSEND stated that he only used this Bitcoin account twice and on those two occasions, it was to pay for the controlled substances. TOWNSEND identified the two payments from his Bitcoin account to COSMIN MUNTEAN's Xapo account. TOWNSEND stated that the controlled substances were shipped to his residence in Brentwood, TN; however, TOWNSEND did not recall where the controlled substances were shipped from. TOWNSEND stated that the medications were shipped with the original pharmaceutical manufacturer's box and he believed the medication was authentic because it was effective in alleviating TOWNSEND's back pain. TOWNSEND was never examined by a doctor nor did he ever obtain a prescription for UltraCod (a schedule III controlled substance). TOWNSEND stated that he knew it was illegal to obtain the prescription via the internet pharmacy without a prescription.

41.     Based upon review of the Romanian judicially authorized intercepts, the Romanian National Police have identified the online pharmacy that COSMIN MUNTEAN is currently operating as 247CLUBVIP, which is the internet pharmacy that

TOWNSEND purchased controlled substances from resulting in Money Gram payments made to Romania and Bitcoin payments made to COSMIN MUNTEAN's Xapo Bitcoin account.

42.     Subpoenaed Digital Ocean records revealed that 247CLUBVIP online pharmacy was, at one point, being operated on a server with Digital Ocean utilizing IP address 178.62.211.193. The Digital Ocean records further reveal that from February 2015 through September 2017, IP address 178.62.211.193 was assigned to one customer who named the server 247CLUBVIP.COM and this Digital Ocean account listed the account holder as being located in Romania. Additionally, the Digital Ocean account was being paid by the following two (2) PayPal accounts: 247med@gmail.com in the name of COSMIN MUNTEAN/AZEC ALPHA LTD and marianadr1977@gmail.com in the name of MARIAN ADRIANA.

## IV.     DIGITAL CURRENCY AND BITCOIN

43.     Digital currency (or cryptocurrency) is a decentralized, peer-to-peer network-based digital medium of value or exchange which can be used as a substitute for fiat currency (*i.e.*, currency created and regulated by a government) to buy goods and services or exchanged for fiat currency or other digital currencies. Digital or cryptocurrency can exist digitally on the Internet, in an electronic storage device, and in cloud-based servers. Although not stored in any physical form, public and private keys are used to transfer digital currency from one person or place to another can be printed or written on a piece of paper or other tangible object. Digital currency can be exchanged

directly person to person, through a digital currency exchange, or through other intermediaries.

44. Bitcoin, Bitcoin Cash, and Bitcoin Gold are types of digital currency. Bitcoin payments are recorded in a public ledger that is maintained by peer-to-peer verification, and is thus not maintained by a single administrator or entity. Bitcoins are stored on digital "wallets." A digital wallet essentially stores the access code that allows an individual to conduct bitcoin transactions on the public ledger. To access bitcoins on the public ledger, an individual must use a public address (or "public key") and a private address (or "private key"). The public address can be analogized to an account number while the private key is like the password to access that account. Even though the public addresses of transactors are recorded on the public ledger, the true identities of the individuals or entities behind the public addresses are not recorded. If, however, a real individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by that individual or entity. Bitcoin transactions are, therefore, described as "pseudonymous," meaning they are partially anonymous.

45. Xapo, Inc. informed case agents that each of the five (5) Subject Accounts have multiple "wallets" or "within them which are described as sub-accounts or sub-wallets for holding different currency (USD, Bitcoin, Bitcoin Cash, Bitcoin Gold, Romanian lei), but all of the sub-wallets are within one account per account holder. The funds can be readily moved from one currency in a sub-wallet to another currency in another sub-wallet within the same account. The value of the digital currency (Bitcoin, Bitcoin Cash, and Bitcoin Gold) in relation to the U.S. dollar is constantly changing so the

exact value is unknown until the funds are transferred out. Xapo, Inc. stated that most Bitcoin companies allow the account holder to control the "key" for each wallet or sub-wallet and that "key" is needed to transfer or remove funds; however, with respect to Xapo, Inc. Bitcoin accounts, Xapo, Inc. controls the private "key" to each wallet or sub-wallet.

46. As set forth above, review of DEA records reveals that neither GOLDPHARMA24 nor any of the other affiliated online pharmacies identified to date in this investigation are registered as online pharmacies, and thus, the online pharmacies' sale of controlled substances is in violation of C.F.R. § 1301.11(b) and Title 21, United States Code, Sections 823(f) and 841(h), even if the internet pharmacies required a prescription. Additionally, review of DEA records reveals that none of the individuals identified as being associated with the GOLDPHARMA24 online pharmacy or affiliated pharmacies are DEA registrants, that is, registered to prescribe or distribute controlled substances. Moreover, given that the investigation to date has revealed that GOLDPHARMA24 and its affiliated online pharmacies, have not required a prescription to purchase controlled substances via the online pharmacies, there is probable cause to believe such sales are in violation of Title 21, United States Code, Section 841(a), 841(h), 843(c)(2)(A) and 846 (distribution of controlled substances and distribution of controlled substances by means of the Internet). Finally, as set forth above, the majority of the drugs advertised for sale by the GOLDPHARMA24 online pharmacy and affiliated online pharmacies and sold to undercover agents and other customers during the course of this investigation are controlled substances. However, to the extent GOLDPHARMA24

29

online pharmacy and affiliated online pharmacies are selling non-controlled pharmaceuticals, e.g., of Viagra, such sale, without requiring a prescription, violates FDA regulations.

47.     Under 18 U.S.C. § 984, a court may order the forfeiture of either (a) any funds in a bank account into which monies subject to forfeiture have been deposited or (b) any identical property found in the same place or account as the property involved in the offense that is subject to forfeiture, without the need to trace the funds currently in the account to the specific deposits that are subject to forfeiture, up to the amount of the funds subject to forfeiture that have been deposited into the account or stored in that place or account within the past one-year period.

48.     I submit that a restraining order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the funds for forfeiture because I have been advised of cases in which, even after restraining order or similar process has been issued to financial institution, the funds sought to be restrained were not effectively restrained by the financial institution. In my judgment, a seizure warrant would be the most effective way to assure the availability of the money sought to seized for forfeiture by the accompanying seizure warrant.

## V.     CONCLUSION

49. Based on the facts and circumstances set forth in this affidavit, I submit that there exists probable cause to believe that all funds, including digital currencies, in the Subject Accounts are:

a) Subject to civil forfeiture to the United States under Title 21, United States Code, Section 881(a)(6) (authorizing civil forfeiture of proceeds of sales of controlled substances and money intended to be exchanged for controlled substances), Title 18, United States Code, Section 981(a)(1)(C) (authorizing civil forfeiture of proceeds of sales of controlled substances), and under the fungible-property provisions of Title 18, United States Code, Section 984, and subject to criminal forfeiture under Title 21, United States Code, Section 853 (authorizing criminal forfeiture of proceeds of sales of controlled substances and property intended to facilitate the commission of controlled substance offenses), as proceeds of, and property used to facilitate, drug trafficking in violation of Title 21, United States Code, Sections 829(e), 841(a)(1), 841(h) and 846;

b) Subject to civil forfeiture to the United States under Title 18, United States Code, Section 981(a)(1)(A) (authorizing civil forfeiture of property "involved in" money laundering), and subject to criminal forfeiture under Title 18, United States Code, Section 982(a)(1) (authorizing criminal forfeiture of property "involved in" money laundering) and Title 28, United States Code, Section 2461, as property involved in money laundering transactions and a conspiracy to commit money

laundering, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and (a)(1)(B)(i) and 1956(h); and

c)      Subject to seizure for purposes of civil forfeiture under 18 U.S.C. § 981(b) and for purposes of criminal forfeiture under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).